has appeared. So wonderful to see you all here. And we are ready to have a discussion with you. Council. Good morning and may it please the court. My name is Rebecca Wallace and I represent the appellant in today's case. Mr. Oscar Alvarado. May I reserve 2 minutes of my time for a bottle? Absolutely. Everyone in today's case agrees that Mr. Alvarado's 6th Amendment rights were violated when his co-defendant Cynthia Alvarado statement was admitted at his trial. Was there a motion made to sever before the trial? There was, Your Honor. It was not successful. Let me ask this. Let's assume that maybe this was the argument that was made to the jury at the end of the trial. I don't know. Let's assume that we take the Bruton statement out of it and we take the Bruton witness out of it, the cousin of Alvarado. Then you still got the vendor. I understand there are discrepancies in the testimony and some of it is perhaps not as reliable as it could be in relying upon Johnson to suggest that that gives rise to the prejudice here. But you still got the testimony of the vendor, whose name I can't pronounce, Shmertoff or something like that, who says that he saw Alvarado come into the park, walk up to someone with a gun, he saw a gun at that point, snatch something or yank something, he wasn't exactly sure what to use, and then run. You then have another witness saying that they saw your client with a gun, and then you have the woman who's in the car who didn't see the actual shooting but did see your client with a gun, some pull out a gun, and then heard three or four shots. And there's some discrepancy about whether or not the decedent was shot in the face or not. But that seems to be easily resolved because even the police officer, when he or she arrived, said that he thought the bullet was in the face because of the amount of blood on the face. Given all of that, even without that offending Bruton statement, it seems to me that there's more than enough evidence to sustain the conviction. So then how do you get prejudice? Well, Your Honor, when we look specifically at the robbery, and even more specifically to the elements of robbery, that forceful taking is what the Commonwealth was unable to establish beyond a reasonable doubt without that statement. It's got the vendor who says that he had a gun in his hand when he took something. That's enough to give you first-degree robbery under Pennsylvania law, let alone second-degree. But clearly there's that first-degree robbery because it's a forceful taking. I don't have the statute in front of me, but if my memory is correct, it's the taking a property of another by means of putting the person in fear of either through infliction of serious bodily harm or fear of serious bodily harm. That's not an exact quote by any means. You've got that because the taking is accomplished by producing a gun, and then he flees, and then shots are heard. That to me seems, it gives you first-degree robbery, if not first-degree robbery, second-degree robbery. Killing occurs in the course of that, which gets you second-degree murder. That's why, under Pennsylvania's felony murder rule, that's why I'm struggling to see how the admission of that statement caused your client prejudice. Well, first, Your Honor, that story that the Commonwealth brought about exactly what happened when it came to the robbery, that depends on that singular witness, Edwin Shermody. And when we look at Edwin Shermody and we look at his credibility issues, and when we look at the jury verdict, for example, and the jury questions, we can see that the jury did not trust Mr. Shermody. Well, I'm not so sure that's true, because you can look at the questions as them being confused about various degrees of robbery under Pennsylvania law, and what the felony murder rule is, and the various degrees of murder. And given the homicide instruction, I don't know how many times, juries always come back with those same questions. Can you redefine first degree, second degree, third degree? What's the difference between second degree and third degree murder? What is the difference between first degree, second degree, third degree robbery? Those are standard jury questions that they come back with, because it can be very confusing. Well, Your Honor, if we look at their verdict specifically, in the closing argument, the prosecutor used Edwin Shermody's testimony to argue that there should be first degree murder, that there should be a conviction of first degree murder. If the jury had truly believed Mr. Shermody, and believed the assertions that the prosecutor was using about the point blank, that that came from Edwin Shermody, then they would have convicted him of first degree murder. Shermody's testimony could, in theory, support both the second degree, tethered to the robbery, and first degree if the jury used his testimony to establish intent, correct? If the jury had believed them, yes. But the jury could have believed Shermody to establish second degree felony murder, right? It's possible, Your Honor. His testimony was replete with references to the robbery. It was, Your Honor. However, when we look at Mr. Alvarado's defense in this case, his defense in this case was to undermine the credibility of Mr. Shermody, to point out the flaws and the bias that were evident from Mr. Shermody's testimony. And his ability to do that, to make a compelling argument, to point out those flaws, was undercut when the prosecution used Cynthia Alvarado's statement, when they admitted it, and when they used it directly against him in the closing argument. If you take the statement off the tape, doesn't Beltran also support the robbery conviction? Respectfully, Your Honor, no. Because when it comes to that element of that forcible taking, Mr. Shermody is the only one who offered any evidence about that forcible taking of the robbery. There's circumstantial evidence to be sure. However, that circumstantial evidence, excuse me, also suffers from serious flaws. I'm so sorry. Isn't the point that the corroboration of the other elements of Shermody's testimony lends credibility to the robbery? I think that's the judge's point. If Shermody testifies to four points, you're bringing into question point three. If Beltran can corroborate him on points, in this hypothetical, on points one, two, and four, that lends credibility to Shermody, or Schermody, however you pronounce it. And that's really the question. If you take away the Alvarado reference, is there enough? It's hard to say that there's, you know, that it's only him or it's not enough, isn't it? Well, Your Honor, two points on that. The first point I would say is that the district court that was reviewing Cynthia Alvarado's habeas case noted that the jury likely didn't believe Margie Beltran because they acquitted Ms. Alvarado and Mr. Alvarado of conspiracy. My second point on that would be that this court has only found that eyewitnesses to a crime have overlapping testimony that cures that Bretton violation when that testimony is specifically that overlapping. So if we look, for example, at some of this jury's, or excuse me, this court's prior cases, such as Ely versus Erickson, or Washington versus Secretary of Pennsylvania, in those cases we see that when there are multiple eyewitnesses who can refer to overlapping testimony, that is, they both saw the actual pointed issue, that that's when the Bretton violation is cured. They both heard the pointed issue. There are several references where Ms. Beltran says, I just hear the lady saying stuff in Spanish, he took my pills, he took my pills, get him. Your Honor, we'd assert actually that that goes against the idea that there was a corroboration between the two stories because Mr. Sherman identified the drug dealer as a man, and Ms. Beltran is out here telling us that it's a woman who's saying, he took my pills, he took my pills, get him. There's an additional inconsistency between the two stories, or the two narratives, which is Mr. Sherman alleges that Mr. Alvarado goes up and immediately, no conversation, no interaction, no nothing, pulls out the gun. But that doesn't line up with what Ms. Beltran alleged was the plan. What Ms. Beltran alleged was supposed to happen, that he was supposed to ask for a play. And that gives rise to a potential for reasonable doubt, a potential for alternatives. Yeah, but that doesn't really, that may be the weakest of your arguments. Because the fact that he didn't follow the plan that Beltran had suggested to him, doesn't really cut anywhere. Because he may well have simply gone to the park and figured he's going to pull out his gun and forget any negotiation without pulling out the gun. I'm just going to pull out my gun, cut right to the chase here. In terms of the specific intent thing, what troubles me is that, it troubles me in terms of the argument, not the verdict. The jury could have even easily concluded that he didn't specifically intend to kill the deceiver. He just fired recklessly at her. Now that gets you away from first degree murder, but it still gives you felony murder. Only, Your Honor, if we believe the testimony of Edwin Sherman. And I would also allege that the questions that the jury sent back about the number of pills that were present, indicate that they were using Cynthia Alvarado's statement and the reinforcement of Cynthia Alvarado's statement towards Margie Beltran's testimony, towards Edwin Sherman's testimony, that they were taking that into account. Go ahead. Your Honor, the jury sent back two questions. Cynthia's statement to the detective regarding the number of pills, that's on JA-295. Margie Beltran's statement during her testimony in court regarding how many pills Oscar came back to the car with, also on JA-295. And what we see there is that the jury, in that same group of questions, is asking to compare what did Cynthia's statement say about that number of pills with what did Margie Beltran say about that number of pills. They're using that as corroborating evidence to try and put two and two together to get to that second degree murder charge because they didn't trust Edwin Sherman. And furthermore, Your Honor, when we look at how the prosecution used that statement, how they used the statement against Mr. Alvarado, we see that it wasn't just used in passing or as we see in Johnson or in Brown that it was the key to unlock the identity. Identity was pretty clear to begin with. It was used specifically to reinforce the testimony of Edwin Sherman. So the quote, Your Honor, is Edwin Sherman specifically described to you the robbery. He specifically described to you that Oscar Alvarado went right up to the drug dealer, which he described as an old head. Now, Your Honor, Mr. Sherman, nowhere in his testimony did he ever use the phrase old head. Instead, old head comes directly from Cynthia's statement, which came out under the last witness that the jurors heard from. But the prosecution is using that phrase, old head, which is distinctive, to bolster the testimony of Edwin Sherman, to link those two things together so that Mr. Alvarado's arguments that go towards his credibility are undercut. What's more, Your Honor, this case is well in line with recent precedent of this court in which you found an error was not harmless. We see in cases like Johnson where there was an otherwise unbelievable witness who had credibility issues in the large and the small scale in terms of bias, in terms of contradiction, that when the statement of the co-defendant was used to bolster that otherwise unreliable witness, that that led to an error that was not harmless, that that led to the jury being prejudiced. And that's the same thing that we see in this case. What do you make of Sherman's testimony at 1-0-6 where he says he walks through, he walks to this older guy? Does that undermine your suggestion that they relied on the old head reference? No, Your Honor. We're arguing that that's because old head is such a distinctive phrase. And that phrase comes out specifically in that statement of Cynthia Alvarado. And what's more, Your Honor, we've already discussed the discrepancy in today's case between the gender, the gender that Edwin Sherman says and the gender that Margie Beltran says. And by just using old head, the phrase that comes up in Cynthia Alvarado, they don't have to address that discrepancy at all. So in some ways, Your Honor, it's actually worse that the prosecution is using it to smooth over an additional issue in Edwin Sherman's testimony. And Your Honor, it's not just one time that the prosecution uses it. They use it twice in their closing. They also say he sees Oscar get out and go over to the old head and stick a gun in him and rob him. So again, they're using it to link Edwin Sherman to the robbery to Cynthia Alvarado's statement, which led to that second-degree murder, which led to that affirmative conviction of robbery. If Your Honors have no further questions, I see that I've reached the remainder of my time. Judge McKee? No, fine argument. I'm not sure it's right. It's a very, very fine argument, Ms. Wallace. I commend you for it. Okay, thank you. Counsel? May it please the Court, David Napierski for appellees on behalf of the Philadelphia District Attorney's Office.  Mr. Napierski, at the outset, let me just commend you on your brief. I cannot tell you how many briefs I have read from Philadelphia District Attorney's Offices where every single point that could be argued is argued to the death. Things that were glaringly either not relevant to what you had to do to win or were wrong was argued tooth and nail like the end of the universe depended on it. To pick up a brief where two pretty damaging points, theoretically damaging, are conceded in terms of the Bruton Statement, it's really incredibly refreshing. And I don't know if you're responsible for it or Ms. Winkelmann or who's responsible for it, but I really do commend you on your brief. Thank you so much, Your Honor. I'll say it was a team effort, we'll say. Okay. So in this case, Mr. Alvarado... Why hasn't Ms. Wallace write about the old head reference, which I had thought of. I didn't pay that much attention to it, frankly, when I read the Alvarado brief. But she really did make that argument in a way that does seem to bring the identity of Alvarado directly to the fore by using the Cousin's Statement, by that use of that term old head. Sure, Your Honor. Well, first I would say that the use of the term old head, if it had any effect at all in the closing, would be to point out that the other person they were talking about was Mr. Alvarado, which we've already conceded there was a Bruton error there. Second of all... But why wouldn't that be tantamount to using the statement against him? Because they use that phrase that's only in the statement to identify who the shooter is. Why isn't that prejudicial under Johnson? Well, I... I think that the phrase old head was used, honestly, I believe, was a slip of the tongue by the prosecutor. I think if you look at the sentence where the old head phrase is contained, she's describing Edwin Schermetti's testimony and she's describing it accurately except for the words old head. Now, Schermetti had called the robbery victim an old man as opposed to an old head. And to me, that doesn't read as... I'm intentionally relying on the statement that maybe reads as a slip of the tongue because it only happens... Let's assume it's unintentional, but even if it's unintentional, does it matter? Well, I don't... Well, I've got two points here. I don't think it matters in general. I don't think old head is quite as a remarkable moniker as the appellant might make it sound. I've been called an old head many times myself. So have I. So have I. But Chief, your colleague made the point that it was referenced twice. Once, slip of the tongue. Twice, quite intentional, I would say. I have to disagree, Your Honor, only because both times it was mentioned it was talking about the same thing. It was talking about Schermetti's testimony. Schermetti said this and he said an old head and then she revises it. Schermetti said this, said it was an old head. It sounds to me she's not using it in any other context than discussing Schermetti's testimony, which to me sounds like a slip of the tongue. Maybe she got confused on who said what, on who called him an old head or an old man. Okay, so... Okay, I'll take that point. Let's say the prosecutor was confused. But the... Interestingly, the confusion was the reference to old head came from the statement. The reference from Schermetti's testimony was old man, which is quite different. I frankly can't imagine having a slip of the tongue for old head because it has a particular meaning in sort of common urban dictionary parlance. So... Well, I don't think... Even if that was some kind of reliance on the statement in the closing, I don't think it actually makes a difference here. Under Johnson v. Lamas, one of the reasons this court gave for finding no prejudice and harmless error was that in the prosecutor's closing there, the prosecutor devoted equal time to the offending statement and to live witness testimony. The court said that shows that it wasn't a central tenet, it wasn't a key point, because it was equal time here. Not only do we not have equal time to the statement, we've got no direct references to the statement. We have two oblique references to the statement with the phrase old head, and that's really it. And so under Lamas, I argue that that's simply not enough to show prejudice. What about the positioning of the statement? The introduction of the Alvarado statement was the last thing the jury heard. When that's what they hear, everyone's position in the car is clear. Isn't the reference to Oscar Alvarado that much more clear and that much more prejudicial? Isn't it, so to speak, the last piece of the puzzle? Well, I think that I would point out that the statement as it was was introduced as part of a case against Cynthia Alvarado, not Oscar Alvarado. So when the evidence against Oscar was complete, they put in the evidence against Cynthia. It was the last thing that they heard. I mean, that's just true. But they came with a cautionary instruction from the judge, and the fact that it was the last thing they heard, I will concede it might have been fresher in the jury's mind than it would have otherwise been, but I still don't think that rises to the level of prejudice here. In terms of the no harm, no foul argument in the jury position with the very compelling argument Ms. Wallace made with respect to the different genders. In other words, it shmeared Edwin. Edwin says the shooter, I mean, that it was a he as opposed to Beltran, who says it was a she. Right, well, I think that actually their testimonies are not actually all that inconsistent. What Cermetti testified to was that, okay, this robbery happened. I saw him stick a gun in this older Hispanic man's stomach in the middle of the park. 10 to 15 people were following him yelling things like, he robbed me. Both men and women were, according to him, yelling things like, he robbed me, he took my pills. Then you have Cermetti saying, I heard a lot of general commotion, and among the commotion, I heard a lady saying, he took my pills. Those two statements to me are not that inconsistent. He said he took pills from one person, though, didn't he? What's that, Your Honor? He only took the pills from one person, the dealer. He didn't. He did. It sounds like he's saying maybe he took some from some of the customers that were in the park. No, I'm saying that according to the testimony, for whatever reason, there were numerous people yelling things like, he robbed me, he took my pills. At least that's what the testimony was. I'm curious. When I read the research thing about this, it's not really relevant, but I'm just curious as to whether or not there was an objection to that statement coming in, he took my pills, which establishes the robbery, clearly relevant, but it's a hearsay problem. I guess it comes in either as part of, I don't know whether it was raised just now, but it's certainly been excited utterance, I would assume. I'm just curious if it was objected to. I don't think there's an objection. I don't think there was an objection. I would have to go back and check the record on that. I don't believe there was. Okay. So, again, just to reiterate the no prejudice here, there was reliable evidence coming from live witness testimony from Edwin Schermetti and from Margie Beltran, and to a lesser extent, the third witness, Elizabeth Ortiz, who did not see the robbery, she only saw the murder, but her murder testimony corroborates the murder testimony of Schermetti. So we've got corroborated live testimony from Schermetti on a number of points. Leading up to the robbery and then after the robbery. We also have the co-defendant statement here, which was, in my view, cumulative of the live witness testimony. I did not really add anything additional or any detail that the jury hadn't already heard. And I would also point out that at trial, there was no, and I believe to this day, there's been no alternative explanation given as to what happened if not, if the predicate offense to this murder was not a robbery that caused people to run out of the park and yell and cause commotion and cause the decedent who, it was testified to that the decedent was a peaceful woman to cause her to flail her arms and approach a car and stick her head near the window. There's no, there's no alternative explanation as to why any of those events transpired if not the robbery that Edwin Schermetti said he witnessed. Is it the defense's obligation to provide an alternative scenario? It's, it's not, Your Honor. I was just pointing out that we haven't been provided for. It's not an obligation but may be persuasive to provide an alternative explanation. You wiggled out of that one very nicely, Your Honor. You wiggled out of that one very nicely. Thank you, Your Honor. Thank you, Your Honor. Are there any other questions? Thank you. Your Honors, thank you so much. I see the remainder of my time. May it please the Court? I have two points in rebuttal, Your Honor. First, referring to Old Head, I would agree with the Court here that it doesn't matter if it was an intentional or unintentional slip of the tongue. What matters, as always, is the effect that it had on the jury. And when we look at the jury verdict and we look at the jury questions, we can see that it did have an actual effect on them. My second point would be regarding the Johnson v. Lamas. And I'm glad that Mr. Napierski brought this up because I think Johnson v. Lamas is an excellent point to distinguish for us, in fact. Because in Johnson v. Lamas, we saw that there were two separately unreliable eyewitnesses who both testified that they saw the point of the crime   we don't have that. We have one eyewitness whose testimony was not overlapped with by the other witness at all. And instead, the eyewitness who testified instead of there being three separate witnesses, the co-defendant statement, and then two eyewitnesses who all agree on exactly what happened, here we have one unreliable eyewitness, a separate eyewitness who's also unreliable but didn't see the robbery itself, and then we have the statement. And Your Honor, the statement is important because it reinforces that narrative. It reinforces that narrative of what exactly happened on that day. And it does give more detail by reinforcing that Mr. Alvarado went up and tried to get a play, which again,  with Mr. Shermody's testimony. So it reinforced Mr. Shermody and undercut Mr. Alvarado's ability to raise that defense. We ask that in light of the use of the prosecutor's statement against Mr. Alvarado and the effect that it had on the jury, that this court reverse the district court's decision and remand with instructions to grant Mr. Alvarado's petition for habeas corpus so he can receive a fair and constitutional trial. Thank you. Thank you. Thank you. Is it Ms. Eisenstein? Eleanor Barrett, Your Honor. Oh, great. Looked at the wrong place on the brief. In any case, welcome and wonderful job  kudos to the students and the firm. Ms. Wallace, nicely done. Just graduated? Yes, Your Honor. So wait a minute. It's July 16th or 15th. What is it? 16th. The bar is next week? It's a week from Monday, Your Honor. A week from Monday. We're talking confidence here. Well, I hope something that you studied for this argument was on the bar because it's obviously taken some time away from your study. So good luck with the bar and I hope this was a nice start to your career. Certainly from our point of view, it was excellent. Thank you so much, Your Honor. Thank you all.